# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1910
_____

Rachel Howard, as Executrix of the Estate of C.R. Howard deceased

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: March 11, 2020
Filed: July 6, 2020

_____

Before GRUENDER, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Rachel Howard (Howard), the widow and executrix of her late husband's estate, brought suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 et seq., alleging a claim of medical malpractice on behalf of the estate and alleging individually a claim of wrongful death. Howard's claims stem from injuries suffered by her husband during a fall, shortly before his death, while hospitalized in a Veterans

Affairs hospital. After a bench trial, the district court[1] dismissed Howard's claims. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

This case arises from the death of Mr. C.R. Howard, who died on March 14, 2015, at the age of 75. In 2011, Mr. Howard was diagnosed with multiple myeloma, a blood cancer. Despite treatment efforts, Mr. Howard's disease continued to progress, and as of February 2015, his treating hematologist believed that Mr. Howard had reached the last of the available courses of treatments. Mr. Howard was admitted to the John L. McClellan Memorial Veterans Hospital in Little Rock, Arkansas, a facility operated by the Department of Veterans Affairs, on February 11, 2015 after experiencing neutropenic fever. When he was admitted, he was designated a high fall risk under the hospital's policy, which evaluates the potential fall risk of a patient and imposes certain protocols to prevent falls. Among the protocols put in place based on Mr. Howard's risk assessment, medical staff were to reinforce the need for assisted or supervised transfers and remain with Mr. Howard while he was using the toilet. After Mr. Howard's family reported that he had fallen during one of at least two trips to the bathroom unassisted by medical staff, staff entered an order in Mr. Howard's chart that he was to use a bedside commode. Mr. Howard's medical chart reflected that he had been experiencing intermittent bouts of dizziness and slurred speech.

On February 16, 2015, Mr. Howard suffered a fall while attempting to use the bedside commode. On that day, two nurses assisted Mr. Howard in using the commode, which was located next to his hospital bed. Mr. Howard was able to transfer to the commode under his own power, with only the assistance of one nurse's

[1]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

steadying hand. One of the nurses observed that while he was sitting on the bed prior to the transfer, Mr. Howard did not appear unsteady or confused, did not slur his speech, was lucid, and was able to verbally confirm with the nurse that he was ready to stand. Once Mr. Howard was sitting on the commode, one nurse stood to Mr. Howard's side while the other stood in front of Mr. Howard. Mr. Howard was able to carry on a conversation with the nurses throughout the transfer and for some time while he was sitting on the commode. At some point while Mr. Howard was seated, he folded over and fell off of the commode, striking his head on the floor. He exhibited seizure-like activity before becoming non-responsive. Because the nurses were unable to detect a heartbeat or observe respiration, one nurse called the code team[2] while the other nurse began cardiopulmonary resuscitation (CPR). When the code team arrived, it took over CPR and ultimately used a defibrillator to get Mr. Howard's heart beating again. The code team lifted Mr. Howard back into his hospital bed, after which one team member placed Mr. Howard on a ventilator. Howard was present in Mr. Howard's room at the time of his fall and witnessed each of these events.

Mr. Howard was then transferred to the intensive care unit. The following day, Mr. Howard was taken off the ventilator and displayed a decline in his ability to move his extremities. An MRI revealed that Mr. Howard suffered a fracture of the cervical spine. Mr. Howard was then transferred to the University of Arkansas for Medical Sciences (UAMS), where, on February 20, 2015, he underwent surgical repair of his spinal fracture. The surgery successfully repaired the fracture, and Mr. Howard demonstrated improvements post-surgery. However, based on the state of his multiple myeloma, his treating hematologist did not believe Mr. Howard was a candidate for rehabilitation. Mr. Howard was discharged from UAMS for home hospice on March 2, 2015. Mr. Howard died on March 14, 2015.

---

[2]A code team is the group of medical personnel tasked with resuscitation efforts when a patient is in cardiopulmonary arrest.

-3-

Howard, as widow and executrix of Mr. Howard's estate, then brought this action against the government pursuant to the FTCA, alleging claims of medical malpractice and wrongful death. The matter proceeded to a bench trial, where the court heard testimony from the two nurses who were attending to Mr. Howard during the fall and Howard, all of whom witnessed the fall. The nurses' testimony conflicted with Howard's testimony, with the nurses testifying that Mr. Howard demonstrated no signs of dizziness or disorientation before the fall and Howard testifying that Mr. Howard was displaying signs of dizziness before transferring to the commode.

The district court then heard testimony from expert witnesses for both Howard and the government regarding the applicable standard of care. Howard's nursing expert, Janet Scott, R.N., testified that it would be a breach of the applicable standard of care to allow Mr. Howard to get out of bed if he were dizzy. Scott further stated that the standard of care required his nurses to have a hand on him while he was using the commode and to stand directly in front of him. Howard's physician expert, Dr. Thomas Huffman, who testified about his experience managing nurses throughout his career, explained that the best way to have control over a patient while he is using a commode is to have a hand on him or his clothing. Dr. Huffman opined that the nurses were not close enough in front of Mr. Howard to catch him before he fell. The government's nursing expert, Holly Langster, B.S.N., F.N.P., M.H.A., D.N.P., testified that proper patient care includes recognizing the dignity of the patient and providing as much privacy and sense of normalcy as possible. Langster testified that the applicable standard of care in Mr. Howard's situation would require the presence of a nurse while Mr. Howard used the commode and for the nurse to have hands on Mr. Howard until he was seated. Langster stated that she does not teach nurses to have a hand on the patient while using the commode and that hands on a patient is not guaranteed to prevent a fall. Langster further testified that the standard of care requires a nurse to stand with his or her legs in front of the commode and to be within an arm's length of the patient. She opined that the nurses had given Mr. Howard a high level of attention and care. She noted that her review of the records did not

indicate Mr. Howard appeared dizzy at the time of the fall, but that if he had been, the nurses probably should not have allowed Mr. Howard to stand to reach the commode.

The district court also heard expert testimony from witnesses for both Howard and the government regarding Mr. Howard's injuries from the fall, his progress following surgery, and the impact of his injuries on his overall health. Finally, the district court heard testimony from Mr. Howard's treating physician, who detailed Mr. Howard's battle with multiple myeloma, including that Mr. Howard had reached the end of available treatments, and that, in March 2014, he had discussed with Mr. Howard discontinuing treatment and going into hospice, which Mr. Howard declined. The treating physician also testified that as of February 2015, Mr. Howard's multiple myeloma had continued to progress and was not well controlled.

After the bench trial, the district court entered judgment dismissing Howard's claims. In its meticulous and well-reasoned 60-page opinion, the district court first noted that, because the standard of care applicable to Mr. Howard was not a matter of common knowledge, expert testimony was required to establish the standard of care. The district court evaluated the testimony of the experts on the applicable standard of care, crediting the testimony of both nursing experts, but not the testimony of the physician who had only managed nurses throughout his career. The district court then evaluated Howard's claims.

As to the medical malpractice claim, the district court concluded that Howard failed to prove two elements: that the hospital staff breached the applicable standard of care and that Mr. Howard's injuries were the proximate cause of his death. Regarding the applicable standard of care, the district court made specific findings that use of the bedside commode was appropriate under the circumstances because Mr. Howard was not suffering from any apparent dizziness; that the nurses appropriately evaluated Mr. Howard as being able to use the commode, were within a few feet of him while he was on the commode, and were attentive to and talking to

him the entire time before he fell; that, given the nurses' close proximity and attentiveness to Mr. Howard, there was no need for them to have a hand on him or stand directly in front of him; and that Mr. Howard was not a candidate for additional safety measures, including restraints, a helmet, a fall pad, or a bed alarm. The district court specifically noted that it did not find Howard's description of the fall credible, instead crediting the testimony of the two nurses assisting Mr. Howard at the time of the fall. Based on these findings, the district court determined that Howard failed to establish that the medical provider did not meet the applicable standard of care.

In the alternative, the district court determined that Howard failed to show that Mr. Howard died as a result of his injuries sustained in the fall, rather than from his long-standing battle with multiple myeloma. The district court concluded that, given the evidence of Mr. Howard's declining health based on his multiple myeloma, the evidence did not demonstrate that he would not have died when he did but for the injuries sustained in the fall. Having dismissed the medical negligence claim, the district court dismissed the wrongful death claim, as a wrongful death claim is derivative of a medical negligence claim. This appeal follows.

II.

Howard asserts that the district court erroneously dismissed her medical malpractice and wrongful death claims. "After a bench trial, this court reviews legal conclusions de novo and factual findings for clear error." Kaplan v. Mayo Clinic, 847 F.3d 988, 991 (8th Cir. 2017) (quoting Urban Hotel Dev. Co. v. President Dev. Grp., L.C., 535 F.3d 874, 879 (8th Cir. 2008)). "Under the clearly erroneous standard, we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343, 353 (8th Cir. 2008) (internal quotation marks omitted).

-6-

"There is a strong presumption that the factual findings are correct." <u>Urban Hotel</u>, 535 F.3d at 879.

A.

We begin with Howard's medical malpractice claim. Arkansas substantive law governs Howard's claims as the state where the alleged negligence occurred. <u>See Washington v. Drug Enforcement Admin.</u>, 183 F.3d 868 (8th Cir. 1999). Under Arkansas law, a medical malpractice claim requires a plaintiff to prove three elements: "the applicable standard of care, that the medical provider failed to act in accordance with that standard, and that such failure was the proximate cause of plaintiff's injuries." <u>Webb v. Burton</u>, 85 S.W.3d 885, 891 (Ark. 2002); <u>see also</u> Ark. Code Ann. §§ 16-114-201 <u>et seq</u>. The applicable standard of care requires medical staff to "possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of [their] profession in good standing, engaged in the same type of service in the locality in which [they] practice[.]" Ark. Model Jury Instr., Civil AMI 1501; <u>see also</u> <u>Engleman v. McCullough</u>, 535 S.W.3d 643, 648-49 (Ark. Ct. App. 2017). Howard specifically challenges the district court's factual finding that Mr. Howard did not display any signs of dizziness on the morning of the fall, the district court's credibility determinations, the district court's conclusion that no breach of the applicable standard of care occurred, and the district court's conclusion that, even if a breach occurred, Howard failed to establish proximate cause.

First, Howard challenges the district court's factual finding that Mr. Howard did not appear dizzy the morning of the fall. But as our review of factual findings is for clear error, Howard must present evidence to overcome the "strong presumption" that the district court's factual findings are correct. <u>See Urban Hotel</u>, 535 F.3d at 879. Howard wholly fails to rebut this presumption, instead offering no more than her disagreement with the district court's factual finding that Mr. Howard did not appear

dizzy before the fall. And substantial evidence supports this finding, specifically, as cited by the district court, medical records reflecting Mr. Howard had not recently been administered the antibiotics that could potentially cause dizziness and testimony that Mr. Howard was able to converse, stand with assistance, and maneuver himself toward the commode. On this record, Howard falls far short of leaving us "with the definite and firm conviction that an error was made." Id. (quoting Roemmich, 526 F.3d at 353).

Second, to the extent Howard's argument is premised on a disagreement with the district court's decision to credit the testimony of the nurses attending Mr. Howard during his fall over the testimony of Howard, who also witnessed the fall, credibility determinations are virtually unreviewable on appeal. Ward v. Smith, 844 F.3d 717, 722 (8th Cir. 2016) ("[W]itness credibility determinations are within the exclusive domain of the district court and are virtually unreviewable on appeal."). We decline to second-guess the district court's credibility determinations, particularly where, as here, the district court provided a reasoned analysis supporting these determinations.

Finally, Howard argues that the district court erroneously determined that there was no breach of the applicable standard of care, specifically as to the decision to allow Mr. Howard to use the bedside commode and the failure to place a hand on or stand immediately in front of him while he was using the commode. Again, these arguments are largely premised on the assertion that Mr. Howard appeared dizzy at the time of the fall. However, to the extent that these arguments are independent of Mr. Howard's alleged dizziness, they also fail. The district court heard testimony that the applicable standard of care did not necessarily involve a nurse placing a hand on a patient while using a commode because nurses should aim to preserve the patient's privacy and dignity to the extent possible. And the district court heard testimony that the nurses were attentive to Mr. Howard the entire time he was using the commode, were conversing with him, and remained within an arm's length of him. The district

court was entitled to credit the testimony regarding the attentive care Mr. Howard received in concluding that no breach of the applicable standard of care occurred. See id. Based on this record, the district court did not err in determining that it was not a breach of the applicable standard of care to allow Mr. Howard to use the commode without a nurse's hand on him or without a nurse standing immediately in front of him.

Substantial evidence supports the district court's factual findings with respect to Mr. Howard's condition on the morning of the fall and the care the nurses provided Mr. Howard prior to and after his fall. Therefore, the district court's factual findings are not clearly erroneous. See Urban Hotel, 535 F.3d at 880. We further find no error in the district court's conclusion that, given these facts, Howard failed to demonstrate a breach of the applicable standard of care. Because we conclude that the district court properly determined that Howard did not demonstrate that the medical staff failed to act in accordance with the applicable standard of care, we need not consider Howard's additional argument that the district court erroneously determined Howard failed to show proximate causation. The district court thus did not err in dismissing Howard's medical malpractice claim.

B.

We next consider Howard's wrongful death claim. Under Arkansas law, a wrongful death claim allows certain statutorily enumerated beneficiaries, including the surviving spouse, to recover damages for "the death of a person . . . caused by a wrongful act, neglect, or default[.]" Ark. Code Ann. § 16-62-102(a)(1). "[H]owever, wrongful-death liability only attaches when the defendant's negligence 'would have entitled the party injured to maintain an action and recover damages in respect thereof if death had not ensued.' Wrongful-death actions, in other words, are derivative of the underlying tort committed against the decedent." Day v. United States, 865 F.3d 1082, 1088 (8th Cir. 2017) (quoting Ark. Code Ann. § 16-62-102(a)(1)). Here, the

underlying tort purportedly committed against Mr. Howard was medical malpractice. However, as stated above, the district court did not err in dismissing that claim. In the absence of an underlying tort claim, we agree with the district court that Howard cannot sustain a wrongful death claim. The district court thus did not err in dismissing this claim.

III.

For the foregoing reasons, we affirm the judgment of the district court.

_____